The Commissioners.
From the judicial history of *189 the case, it appears that the prisoner was convicted of the felonious homicide of Louise Siedenwalt, at a court of oyer and terminer, held in and for the county of Hew York, on October 20, last. That upon said trial, only two witnesses testified on behalf of the prisoner, as to facts occurring previous to his arrest. That subsequently to such conviction, as aforesaid, new evidence was discovered, relating to his early life and general family history, and bearing more particularly upon the question of his mental sanity. This evidence, had it been known at the time of the trial, would have justified the defendant in interposing the plea of insanity as his whole defense upon arraignment, and being material and relevant to the issue thus tendered, would have justified the court in appointing a commission of lunacy, to pass upon its merits, pursuant to the Laws of 1874, chap. 446, tit. 1, art. 2, § 30.
Your commissioners further report that their proceedings were duly entered upon at the city prison aforesaid, on Tuesday, December 8, inst., by publicly reading the commission issued to them for execution, and examining witnesses, and the prisoner under oath. That they have, in fulfillment of such duty, examined twenty-four witnesses, exclusive of the prisoner, twenty-two of whom had never previously testified in the case; that two municipal certificates issued under the hand and seal of the mayor of Wendelsheim, in the Grand Duchy of Hesse Darmstadt, were also admitted in evidence as corroborative testimony; and that they also examined the prisoner, Jacob Staudermann, both physically and by oral interrogation.
From all which facts now in evidence before them, it appears that Jacob Staudermann is a native of Wendelsheim, in the grand duchy of Hesse Darmstadt, and about thirty years of age, and that he came to this country about six years ago. That his mother was an epileptic throughout life, and generally regarded as *190 mentally unsound by her neighbors. She died in an epileptic fit. That two of her daughters were similarly affected, one of whom has already died in the same way as her mother. That Jacob Staudermann was a sickly child, suffering in youth from epilepsy, like Ms sisters; that he was always very irritable even when playing, and had the peculiar pallid complexion, incidental to his nervous disease. That he had frequent tremors of a convulsive kind when the least excited, and also hallucinations of sight, during wMch he saw imaginary pigeons, and that his father was heard to say, he wished the child was dead, as he took after his mother. All the facts are supported by cumulative testimony obtained from neighbors, whose character is also vouched for by competent witnesses.
It further appears in evidence, that at or about the period of his sixteenth year, Jacob Staudermann met with a fall from a barn, by which his skull was fractured, and his brain seriously injured. He was in bed for four months, during two of which he was generally delirious, and it was a year before he recovered sufficiently to resume his duties about the house. On account of these injuries to the brain, he was, after due medical examination, exempted from military service. These facts, together with the epilepsy of his mother, are officially certified to by the mayor and town council of Wendelsheim, and which certificates, with all the minutes of testimony, taken upon these proceedings are hereunto annexed as the record of our execution of this commission.
And it further appears in evidence, that since Ms residence in this country, Jacob Staudermann, whether to his old neighbors who have emigrated to this city, or to his new acquaintances formed here, has always appeared strange in conduct and demeanor, foolish in Ms conversation, and irascible and violent without provocation. That in consequence, he was generally *191 regarded as one who might be dangerous, because unreasonable in his judgments, and without evident self-control in acting under their influence. That he had no apparent capacity to measure the effects of his own conduct, as shown by the. overpowering violence with which he would at times reply to the most trivial criticism upon himself or his clothing. And that they did not care about keeping up any acquaintance with him on this account. He himself appears to have withdrawn from the circle of his old acquaintances, so that at the time of his trial, the existence of even his brother was unknown to his counsel, to whom also he gave no information touching Ms friends. He retained throughout the six months he was in prison, preceding his trial, the same moodiness and taciturnity.
The evidence further shows, that he was never really engaged to Miss Siedenwalt, that he imagined himself to be so, and that, through the influence of Ms epileptic constitution, and the grossest practice of self-abuse, his brain was in a state of continuous eretlrism, and his mind as constantly revolving about the idea of marriage with her. Wherever he went, he spoke of nothing else. And he became so unreasonably excited when doing so, as to speak openly of shooting her if she did not consent to marry Mm, and even exhibited a pistol, while so speaking, to one or more witnesses. His account of the*homicide is imperfect as to details, but tallies logically with the action of an unbalanced mind, thoroughly infected by inheritance, dwarfed by the progress of brain disease, and inflamed by the chrome irritation of sexual organs, never permitted to rest.
The act of shooting was simply the phenomenal expression of an epileptic vertigo. He correctly describes the invasion of the attack, and properly localizes it—then, all was gone—he saw notMng—remem *192 bers nothing—and when he came to, and “felt right” the act was done. He says he felt sorry afterwards— says so now, but exhibits none of that grief or deep conviction of its fearful character which is akin to penitence. His mind has not enough intensity of power to localize itself upon any one idea or to perform acts of self-introspection. Disease has degraded him too, far for that.
The medical examination of the prisoner shows, that he is a man of low organization and arrested physical development. He is undersized, with unsymmetrical trunk and limbs ; and has the epileptic complexion with the characteristic expression of the eyes. His intelligence, measured by the ordinary incidents; of a shoemaker’s life, reveals nothing striking in itself. It is possibly neither higher than many, nor lower than some. But his memory has that defective, character which belongs to a grade of imbecility not purely congenital but acquired through and added to-by a life-long heritage of degeneration. He is in habits extremely loathsome and disgusting ; publicly practices self-abuse, and admits it without either shame- or penitence. This is collateral testimony to his mental weakness and moral abasement. His head exhibits the scar left by the fracture of his skull in youth, and he also has hallucinations of sight at times. He has an unsteady gait, and otherwise reveals obscure-symptoms of that form of paralysis known as locomotor ataxy. He is in every sense a being degraded by disease, and uncontrolled by sufficient powers of mind to appreciate duty, either to himself or others, as a moral obligation entailing responsibility.
From all these facts and findings we are of opinion that the prisoner, Jacob Staudermann, when he shot Miss Siedenwalt, was without legal capacity to commit felonious homicide, that he did not know the-nature or consequences of the act he was committing, *193 and was impelled to it by a diseased state of body wholly subjugating Ms mind. We are further of opinion, that he is an imbecile, the result of such disease, and when moved to any efforts involving the exercise of his moral affections, is swayed alone by instinctive impulses.
We find Mm accordingly to be insane and irresponsible within the letter and intent of the statute under which we are acting.
After reading this report to the governor, the question arose as to the final disposition of the prisoner. It was conceded at the outset that he was not amenable to the highest penalty of the law, and his sentence of death was accordingly remitted. But a more difficult problem was that of determining what should be his future place of detention. Under then existing laws, the governor could not commit a prisoner under sentence of death to any State lunatic asylum, with= out rendering such commitment equivalent to a pardon in case the person should afterward recover. So that although the insanity should only supervene after the sentence, and last but a few months at longest,, there was no provision by which the prisoner could be remanded to the county whence he came, to be re-sentenced.* Although Staudermann’s insanity preceded *194 in fact, both his crime and his conviction, as shown by the commissioner’s report, the governor did not feel authorized to commit him to an asylum, and thus nullify a verdict to which, in the light of the evidence, adduced upon the trial, no exception could be taken. The questions which here offered themselves by way of solving the problem were these, viz:
I. What is the present state of health, bodily and mental, of the prisoner ?
II. Does he now need special treatment in an asylum ?
To the first question, the commissioners answered, that the bodily and mental health of the prisoner were susceptible of improvement under a proper system of occupation, diet and removal from all sources of excitement.
To the second they replied in the negative. While it was true that he was an epileptic, yet he did not exhibit the spinal form of that disease. He had never been known since his advent to the United States to have such a convulsion, and although the marked manifestations of epilepsy were never absent from his daily life, he was not irrational or without general self-control. He could not, therefore, be said to have yet arrived at that condition of diathetic permanency necessary to constitute complete insanity at law. His was a case of what courts have always termed partial insanity, and his status was akin to that of the habitual drunkard who kills while in the delirium of mania a potu. He was doubtless without legal capacity to com *195 mit murder when he killed Miss Siedenwalt, but his health was no better and no worse immediately before or after the act, and no commission.of experts previous to his arrest would have certified him as a fit subject for a lunatic asylum. He simply exhibited a form of imbecility, based upon an epileptic diathesis, in which strong animal propensities might bring on at any moment a convulsion, both mental as well as bodily. While leading a quiet mechanical life he might never show any disposition to do harm to others or himself, if kept free from passional excitement, and had there been an asylum for epileptics in this State, the commissioners would have recommended his runoval to it. As it was, they did not undertake' to decide for the executive, but left the final disposition of the case solely to his judgment.
Upon this statement of facts, and under die necessities of the legal conditions surrounding the prisoner, the governor commuted Ms sentence to imprisonment for life.
In less than a month it became necessary to remove Mm to the asylum for insane criminals, where he continues in confinement.

 This was rectified by § 1 of chap. 267 of the Laws of 1876, p. 265, which provides that “The Governor shall possess the same powers conferred upon courts of oyer and terminer in the case of persons confined under conviction for offenses for which the punishment is death. And whenever any person under sentence of death shall be declared insane and irresponsible, by a commission duly appointed for that purpose, the Governor may, in his discretion, order his removal to the State Lunatic Asylum for insane criminals, there to remain until restored to his right mind, and it shall be the duty of the medical superintendent of such asylum, whenever, in his opinion, raid convict is cured of his insanity, to report the fact to the State *194 commissioner in Lunacy, and a justice of the Supreme Court of the district in which said asylum is situated, who shall thereupon inquire into the truth of such fact, and if the same be proved to their satisfaction, they shall so certify it under their official hands and seals to the clerk of the court in which such convict was sentenced, and cause him, the said convict, to be returned to the custody of the sheriff of the county whence he came and at the expense thereof, there to be dealt with according to law.”